UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

JANET E. PONTOLILLO,           )
          Plaintiff,           )
                              )
     vs.                            )        1:06-cv-1509-WTL-TAB
                              )
ST. VINCENT HEALTH, INC.,       )
          Defendant.           )

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on Defendant St. Vincent Health, Inc.'s ("St. Vincent")

Motion for Summary Judgment (Docket No. 61).  Plaintiff, Janet E. Pontolillo ("Pontolillo"),

initiated this lawsuit seeking relief on her claims of sexual harassment and retaliation under Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.*, and a claim of retaliation

under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*[1]  The parties have fully

briefed the matter and it is ripe for ruling.

For the reasons explained herein, St. Vincent's motion is **GRANTED in part and DENIED**

**in part**.

## I. PRELIMINARY MATTER

---

[1] Pontolillo's First Amended Complaint (Docket No. 38) also indicates that she is bringing suit pursuant to 42 U.S.C. §§ 1981 and 1981a.  However, as St. Vincent has correctly noted in its supporting memorandum, based on the circumstances of this case Pontolillo has no cognizable cause of action under either of these statutes.  Specifically, it is well-established that claims of sex discrimination are not cognizable under § 1981. *See Runyon v. McCrary*, 427 U.S. 160, 167 (1976); *St. Louis v. Alverno College*, 744 F.2d 1314, 1317 (7th Cir. 1984).  Thus, to the extent that Pontolillo intends to make such a claim, it is **DISMISSED with prejudice**.  In addition, § 1981a does not provide for an independent cause of action; it is simply a remedies provision for Pontolillo's Title VII claims.

Before addressing the motion for summary judgment, the Court notes that St. Vincent has requested that the Court strike Pontolillo's response for failing to provide a Statement of Material Facts in Dispute and for failing to include appropriate and accurate citation to documentation for her factual assertions. Alternatively, St. Vincent requests a ruling that, pursuant to Local Rule 56.1(b), its statement of facts should govern the Court's consideration of the instant motion.

The Court declines to strike Pontolillo's brief. However, the Court agrees that Pontolillo has failed to comply with Local Rule 56.1(b) and, accordingly, will accept St. Vincent's Statement of Facts as undisputed. In addition, to the extent that appropriate citation has been provided, the Court will also consider any additional facts that Pontolillo has included in her response. However, the Court will not scour the record to locate facts or to determine appropriate citations, and the Court will draw its own conclusions from its review of the facts.

## II. <u>BACKGROUND</u>

### A. PONTOLILLO'S GENERAL WORK BACKGROUND AND PERFORMANCE

Pontolillo began working for St. Vincent Indianapolis Hospital in 1998 as a System Support Specialist in the Supply Chain Department. Pontolillo Dep. at 8, 10. She was interviewed and hired by Michael Pool ("Pool"), who became her direct supervisor. *Id.* at 48-49; Pool Dep. at 12-13. In 2002, she was promoted to Data Systems Manger and was responsible for managing the data for the supply chain and overseeing the mailroom. Pontolillo Dep. at 9-10. Her duties included maintaining the computer system for supply data and inventory. Pool Dep. at 29. In addition, from 2003 through July 2004 she was required to work with consultants and other personnel to make sure that the installation of a new computer system stayed on schedule and within budget. Pontolillo

Dep. at 57-58.   During this same period, the Supply Chain Department was transitioned to St. Vincent.   *Id.* at 18.   On July 1, 2004, following the transition, Pontolillo officially became an employee of St. Vincent and Pool became the Executive Director over Pontolillo's department.   *Id.* at 14-15; Pool Dep. at 15-16.

Prior to the transition, Pontolillo performed her job well.   Pool Dep. at 33.   However, following the transition, Pontolillo and her staff became responsible for the data for an entire system and the size of the staff did not increase.   Pontolillo Dep. at 72.   The transition took its toll on the employees and required them to work extensive additional hours.   *Id.* at 101; Pool Dep. at 32.   Pool became somewhat abrasive, yelling at Pontolillo on the phone and instructing her to threaten her supervisees if they would not work extra hours to meet department deadlines.   Pontolillo Dep. at 70-71; Pool Dep. at 112.   Pontolillo and her staff found it increasingly difficult to meet the needs of other directors within the department at the various hospitals in the system.   Pontolillo Dep. at 72.   Directors would often complain and pressure Pontolillo and her staff to complete their tasks of uploading, cleansing ,or extracting data in reports from the computer system.   *Id.* at 69-70.

## B.  ALLEGATIONS OF HARASSMENT AND PERFORMANCE CONCERNS

Sometime during the same time frame in late June or early July 2004, Pool allegedly touched Pontolillo in an offensive manner.   *Id.* at 114.   Pontolillo contends that the two of them were behind closed doors in Pool's office discussing business issues when the conversation turned to Pontolillo's mother and her health condition.   *Id.*   According to Pontolillo, Pool came around the front of his desk and said, "I'm gonna give you a hug," grabbed Pontolillo tightly, rubbed his face against Pontolillo's neck, and breathed in her ear.   *Id.* at 114-16.   Pontolillo responded by saying, "I gotta

3

go." *Id.* at 116.  The next week, Pool again gave Pontolillo a hug in a similar manner.  *Id.* at 117.  This time, Pontolillo pushed Pool away and said "I've got to go."  *Id.* at 124-25.

After these two hugging incidents, Pontolillo claims that Pool would call her into his office about two to three times each week toward the end of the business day and that "basically the same type of stuff" would occur, with Pool getting more assertive over time.  *Id.* at 117.  Pontolillo recalls that in same cases Pool would grab her hips.  *Id.* at 268.  On another occasion, she believes that Pool tried to kiss her but she turned her face.  *Id.* at 267.

Sometime in July 2004, presumably while the hugging incidents were occurring, Pool began to recognize problems with the computer system, Pontolillo's department, and Pontolillo's performance.  Pool Dep. at 46-50, 58-60.  Pool discovered that Pontolillo had not kept system documentation and training materials up to date with the new system changes.  *Id.* at 38, 50-51.  There were also problems in the service area that was responsible for replenishing supplies on hospital floors.  *Id.* at 44.  Pool began considering a reorganization and restructuring of the department to solve the problems and meet the demands of its increased responsibilities.  *Id.* at 46-50.  One of his solutions was to reassigning an employee and a critical area previously under Pontolillo's management to the management of the director who was impacted most by the lack of upload information, something that immediately solved the problem.  *Id.* at 59.  In addition, Pool believed that St. Vincent was too large for everyone to be able to deal with, and so he took steps to open the computer system to various individuals so that they could access information directly rather than having to go through Pontolillo and her staff.  Pontolillo Dep. at 73.

Despite these problems and concerns that Pool had with Pontolillo's performance, he never formally disciplined her.  *Id.* at 91.  However, Pool did engage in verbal counseling sessions with

her to discuss issues.  Pool Dep. at 35.  He also authorized Pontolillo's pay increases, which occurred every year of her employment.  *Id.* at 57.  Further, Pontolillo received a promotion on January 1, 2005, to the position of Director of System Support and Data Systems.  Pontolillo Dep. at 12.  Shortly thereafter, she agreed with Pool's decision to transition her management of the mailroom to another employee who had been absorbed by the Supply Chain Department from another St. Vincent facility.  *Id.* at 63-64.

On January 3, 2005, Pontolillo received from Pool the first negative document about her performance.  *Id.* at 91-93.  The document was a follow-up to Pontolillo's Fiscal Year 2004 review, which presumably was completed at the conclusion of that fiscal year on June 30, 2004.  *Id.*; Pool Dep. at 48-49.  The document was created based on input from peers and subordinates, and it mainly focused on interpersonal issues.  Pontolillo Dep. at 91-93.  Pool counseled Pontolillo about the issues described in the document, including such things as frequent absences from the office, burdening others with personal problems and issues, conflicting orders or confusion of associate roles, and unfamiliarity with systems or data.  *Id.* at 229-32; Def.'s Ex. 3.

Thereafter, as early as February 2005, Pontolillo contends that her work environment became hostile.  Pontolillo Dep. at 143-44.  In addition to the inappropriate touching, Pontolillo claims that Pool was disrespectful in meetings.  *Id.* at 144.  Pontolillo also contends that she was verbally attacked by a secretary during a harsh meeting and other directors and managers did nothing in response to the attack.  *Id.* at 141.  Moreover, Pontolillo and her staff continued to work under increased pressure and complaints from other directors and hospitals that wanted their work to receive priority.  *Id.* at 144.  At the end of February 2005, Pontolillo contacted the employee assistance program ("EAP") to address some of her concerns.  *Id.* at 138.  Even though she had no

5

knowledge of any other employee losing his or her job after raising complaints of sexual harassment, Pontolillo was afraid that she would lose her job if she disclosed her allegations that Pool was inappropriately touching.  *Id.* at 133, 161.

Subsequently, from April 13, 2005, through May 2, 2005, Pontolillo took FMLA leave for facial neuritis.  *Id.* at 135, 144, 234; Def.'s Ex. 4.  On April 19, 2005, during that leave, she contacted Sandy McKinney ("McKinney"), the executive assistant to Joseph Murdock ("Murdock"), who was the head of human resources.  Murdock Dep. at 6, 12, 17-18.  Pontolillo told McKinney about the inappropriate contact with Pool.  Pontolillo Dep. at 145-46.  McKinney then advised that she wanted to set up a meeting with Murdock to address Pontolillo's concerns.  *Id.*  Pontolillo responded that she was not ready to meet with Murdock and that she would contact McKinney when she was ready to talk.  *Id.* at 146-47.  Shortly after her return from FMLA in May 2005, Pontolillo claims that Pool came into her office while she was working with her back to the door and leaned over her while he rubbed the back of her neck.  *Id.* at 130-31.  Pontolillo responded by screaming at Pool not to touch her and to get out of her office.  *Id.*

Thereafter, around July 1, 2005, Pontolillo became aware that her performance review for the prior fiscal year was going to be a negative review.  *Id.* at 91. In particular, Pool planned to rate Pontolillo as a "2-Meets Most Expectations" on her evaluation.  Def.'s Ex. 6.  For Pontolillo, this meant that she would be ineligible for a ten percent annual executive incentive bonus that required a minimum rating of "3-Meets Expectations."  Pontolillo Dep. at 152-53.  In addition to the performance rating, in July 2005 Pontolillo experienced the last instance of inappropriate touching that she recalls.  *Id.* at 126-29.  Pontolillo's mother was gravely ill and she told Pool that she needed to leave because the hospice nurse could not find her mother.  *Id.* at 126-27.  Pontolillo claims that

Pool grabbed her and started rubbing his face against hers, and she felt what she believes was an erect penis rub against her. *Id.* at 126-28. Pontolillo then pushed Pool away and said, "I gotta go." *Id.* at 129.

### C.  PONTOLILLO'S COMPLAINT AND ST. VINCENT'S RESPONSE

This last incident of inappropriate touching led to Pontolillo's decision to finally report Pool because on August 4, 2005, she contacted McKinney and specifically indicated that she was ready to have a meeting with Murdock and that she "had had enough and couldn't do this anymore." *Id.* at 148; Murdock Dep. at 23-24. The next day, she met with McKinney, Murdock, and two other human resources representatives. Pontolillo Dep. at 149; Murdock Dep. at 22-24; Def.'s Ex. 7. Pontolillo told Murdock about the inappropriate touching that she had experienced. Pontolillo Dep. at 149. In addition, she raised concerns about more general problems such as the work environment, required long hours, and her unfavorable performance review. Murdock Dep. at 30; Def.'s Ex. 7. Following the meeting, Murdock contacted Pool's boss, Ian Worden ("Worden"), to inform him of the accusations and concerns raised by Pontolillo and to let Worden know that Murdock would eventually have to meet with Pool to discuss the matter. Murdock Dep. at 32-33. He then met again with Pontolillo to determine exactly what action she needed and wanted. Pontolillo Dep. at 152. Pontolillo indicated that she wanted Pool to stop touching her, that she wanted her performance review rewritten to accurately reflect her performance so that she would eligible for an executive incentive bonus, and that she wanted the Supply Chain Department to be re-educated about the core values of St. Vincent. *Id.*

7

During this time period, Pontolillo contends that Pool humiliated her in meetings and was disrespectful. *Id.* at 80-86; Def.'s Ex. 8. She claims that he went so far as to tell her that she did not fit in with the department and that she should leave. Pontolillo Dep. at 81. She also recalled an incident where Pool had a cold and asked whether anyone would give him a hug. *Id.* at 135-36. Pontolillo alleges that after another manager responded by giving Pool a hug, Pool leered at her over the manager's shoulder "like he knew that I went to HR." *Id.*

Thereafter, on or about August 19, 2005, Pool presented Pontolillo with a finished performance review. Def.'s Ex. 6. Pontolillo disagreed with the review and refused to sign it. *Id.*; Pontolillo Dep. at 239-40. Instead, she prepared a written response to the review and discussed it with Murdock. Pontolillo Dep. at 240; Def.'s Ex. 9. Her response made no mention of inappropriate touching or retaliation. Def.'s Ex. 9.

Sometime after Pool submitted the performance review, Murdock and Worden met with him to discuss Pontolillo's allegations. Pool Dep. at 78-79, 83. The discussion centered on the performance issues raised in the performance review as well as the accusation of inappropriate touching. *Id.* at 83. Pool denied that he inappropriately touched Pontolillo, although he did admit that there had been hugs between the two of them. *Id.* at 84; Murdock Dep. at 34. Murdock instructed Pool to stop, and Pool essentially acknowledged that he would. Pool Dep. at 84. Murdock and Worden then met with Pontolillo. Pontolillo Dep. at 159. During that meeting, Pontolillo cited to the sexual harassment policy and indicated the action that she wanted taken to resolve the situation. *Id.* at 160-62; Def.'s Ex. 28. A subsequent meeting was then set for September 13, 2005, with Pontolillo, Pool, and Murdock. Pontolillo Dep. at 164.

8

Prior to the meeting, Pool and Pontolillo met and discussed Pontolillo's allegations. *Id.* at 165; Pool Dep. at 87-90. Pool indicated that he had "no intent" toward her sexually and pled with her to tell Murdock that there was no intent. Pontolillo Dep. at 165-66. Although Pontolillo never discussed this encounter with Pool, Pool emailed Murdock and indicated that he and Pontolillo had extensively discussed her performance evaluation and issues and that he was willing to revise the evaluation as Pontolillo had requested. *Id.* at 169, 193; Pool Dep. at 92; Def.'s Ex. 10.

Pontolillo and Pool then met with Murdock as planned on September 13, 2005, to discuss the alleged sexual harassment and other complaints. Pontolillo Dep. at 168-69. Pontolillo stated, "I'm gonna give Mike Pool the benefit of the doubt that there was no intent," and indicated that the two of them could continue to work together. *Id.* at 169. Murdock confirmed that there would be no further inappropriate behaviors in the future. Def.'s Ex. 11. The three also discussed Pontolillo's performance rating and the work environment. *Id.*; Murdock Dep. at 47. They agreed that the performance review would be revised and that the score would be increased to make Pontolillo eligible for the executive incentive bonus. Murdock Dep. at 50; Def.'s Ex. 11. Murdock then confirmed that there would be no further discussion with anyone about the issues surrounding Pontolillo's allegations. Murdock Dep. at 48-51; Def.'s Ex. 11. Consistent with the agreement, Pool never touched, humiliated, or disrespected Pontolillo again. Pontolillo Dep. at 86, 170. In addition, her performance rating was increased to "3-Meets Expectations" and Pontolillo received her executive incentive bonus. *Id.* at 171; Def.'s Ex. 12.

## D.  PONTOLILLO'S LEAVE OF ABSENCE AND DEPARTMENT REORGANIZATION

9

Shortly after the September 13, 2005, meeting, Pontolillo was once again pressured by other directors and hospitals to complete work on their projects.  Pontolillo Dep. at 173.  She also had a subordinate scream at her during a meeting for no apparent reason.  *Id.* at 174.  Pontolillo believes that the directors, other hospitals, and subordinate employees were all acting at Pool's direction, although she admittedly has no evidence to support that belief.  *Id.* at 174-76.

Subsequently, on October 5, 2005, Pontolillo initiated an FMLA leave for fibromyalgia and clinical depression.  *Id.* at 183; Def.'s Ex. 16.  She claims that she had a mental breakdown due to the sexual harassment that she had suffered and the continued stress at work.  Pontolillo Dep. at 180.  However, she acknowledges that she was undergoing other stresses in her life as well, such as the ending of her marriage and the death of her mother.  *Id.* at 179-80.

Although Pontolillo's leave was initially approved through November 30, 2005, her leave was repeatedly extended.  Pool Dep. at 104; Def.'s Ex. 16.  On December 1, 2005, Pontolillo contacted Pool's assistant and informed her that she would be out for another four to six weeks.  Def.'s Ex. 17.  Counting the FMLA that she had taken in April and May, this additional leave exceeded the twelve weeks of FMLA leave for the year that Pontolillo was permitted to take.  Pontolillo Dep. at 197; Def.'s Ex. 18.

While Pontolillo was on leave, Pool continued to reorganize the Supply Chain Department.  Pool Dep. at 43-44; Def.'s Ex. 20.  The reorganized department started to take shape in December 2005 and January 2006.  Baugues Dep. at 37.  One area that Pool sought to improve was the service area of replenishment.  Pool Dep. at 44.  To accomplish this goal, Pool created a new position of Director of Replenishment to focus on that area.  Def.'s Ex. 20.  Pool placed three managers under the new director's supervision.  *Id.*  Two of those managers, Jay Works and Ron Runyan, had

10

previously reported directly to Pool.  *Id.*  Another area that Pool sought to improve was the efficiency of data management to avoid problems experienced by other directors and hospitals. Def.'s Ex. 21.  Pool decided that rather than having a Director of Data Management Systems, it would be better to open up access to the system and divide the data management staff and duties among the other directors.  *Id.*  As a result, Pontolillo's position was effectively eliminated; however, a new Manager of Unit Based Services position was left open for Pontolillo at the same salary level in the event that she returned to work from her extended leave of absence.  Def.'s Ex. 20.

Pool offered the Director of Replenishment position to Marge Baugues ("Bauges"), which expanded her scope of duties as an experienced manager in the replenishment area.  Pool Dep. at 26-27.  Baugues accepted the position but expressed some concerns because she and Pontolillo had experienced some issues with each other in the past.  *Id.* at 41-42.  Pool expressed that he still expected the two to get along.  *Id.* at 107.

### E.  PONTOLILLO'S RETURN TO WORK AND SUBSEQUENT TERMINATION

In anticipation of her doctor releasing her to return to work, Pontolillo began attempting to contact individuals at St. Vincent in mid-December to late January to determine when and in what capacity she would return to work.  Pontolillo Dep. at 185-86.  She experienced difficulty in getting a response from Murdock, Pool, or Worden despite leaving multiple messages.  *Id.*  Therefore, on January 4, 2006, she attempted to contact the CEO of St. Vincent and, consequently, spoke with two executive assistants.  Murdock Dep. at 54-57.  During her conversations with these assistants, Pontolillo disclosed information about her allegations against Pool.  *Id.*

The next day, Murdock and Worden had a telephone conference with Pontolillo.  *Id.* at 57-61.  They informed her that she would be receiving a certified letter from Pool dated January 3, 2006, that outlined the details of her new position.  Pontolillo Dep. at 187-88.  They also noted that she would be in a manager position reporting to Baugues.  *Id.*  Pontolillo told Murdock and Worden that she did not want to work under Baugues and requested a transfer, but Murdock indicated that there were no other positions available.  *Id.*  In addition, Pontolillo was reminded that the allegations against Pool were to be considered confidential, and she was warned and acknowledged that a breach of confidentiality would be considered insubordination and result in termination.  *Id.* at 203-04; Murdock Dep. at 58-61.

Shortly thereafter, Pontolillo received Pool's letter and discussed it with him.  Pontolillo Dep. at 194.  She again expressed her concern about working under Baugues, and she noted that she had no experience working on the floor in the hospital and had no medical or nursing background like Baugues did.  *Id.*  However, none of the managers reporting to Baugues had medical or nursing backgrounds, including the individual who eventually replaced Pontolillo after her termination.  Baugues Dep. at 143, 147.  Pool assured Pontolillo that he would supervise the relationship and that Pontolillo would be provided necessary training to perform her job.  Pontolillo Dep. at 194.

Pontolillo was ultimately released to return to work on January 30, 2006, but with a limitation that restricted her to working only four hours per day.  *Id.* at 236-37; Def.'s Ex. 22.  Based on her past experience with Baugues, Pontolillo believed that her new immediate supervisor would be a "control freak" with a more stringent management style that would lead to write-ups for minor rule violations.  Pontolillo Dep. at 120-21.  Indeed, this is precisely what she experienced because on two occasions during her first week back to work Pontolillo received write-ups for exceeding her

work restriction by about ten minutes, one of which occurred due to a staff meeting. *Id.* at 111-12.

Pontolillo returned to work full time without restrictions on March 13, 2006. *Id.* at 237-38. Shortly thereafter, Baugues issued Pontolillo a write-up for not working a full forty-hour week. Baugues Dep. at 75-80. This would not be the last time that the two clashed. For instance, while Baugues provided some training, Pontolillo contended that she wanted or needed some additional training in order to be comfortable with her job. *Id.* at 82; Pool Dep. at 109. At the same time, Pontolillo complained that Baugues was micro-managing Pontolillo's duties and staff. Baugues Dep. at 104-05. In addition, Pontolillo had concerns about how she and other employees were treated when getting sick at work. *Id.* at 86-87, 93-95. She also believed that her health was endangered because she did not know the proper isolation room procedures. Pontolillo Dep. at 221-22.

After several of these clashes had occurred, Pontolillo met with Baugues on April 3, 2006, apparently to resolve their disputes. During that meeting, Pontolillo shared in detail her previous allegations of sexual harassment. Baugues Dep. at 111-13; Def.'s Ex. 23. Baugues claims that she had been unaware of the allegations prior to the meeting. Baugues Dep. at 115; Pontolillo Dep. at 200. In any event, Pontolillo understood that her disclosure was a violation of confidentiality and that it would likely lead to her termination if Baugues shared the disclosure with Murdock or Pool. Pontolillo Dep. at 202-04. She asked Baugues not to reveal the discussion and hoped that Baugues would keep it secret. *Id.* at 199-200. Nonetheless, Baugues believed that she had a duty to report the allegation to human resources and, accordingly, she immediately contacted Murdock about the incident. Baugues Dep. at 114.

Thereafter, Pontolillo was absent from April 4 to April 7, 2006.  Def.'s Ex. 24.  During that time, she filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sex and disability discrimination and retaliation.  Pontolillo Dep. at 253-54; Def.'s Ex. 25.  When she returned to work, Baugues disciplined Pontolillo about the propr procedures for calling in sick.  Def.'s Ex. 24.

Meanwhile, Murdock began to obtain additional information suggesting that Pontolillo was breaching confidentiality.  Murdock Dep. at 94-96.  Specifically, he received documentation from Rob Bogdon ("Bogdon"), a materials consultant in the Supply Chain Department, that on March 29, 2006, Pontolillo had asked if Bogdon told his wife that Pool had groped Pontolillo.  Def.'s Ex. 26. In addition, on April 14 and 17, 2006, Murdock learned that Pontolillo had attempted to contact other St. Vincent management level associates to discuss her allegations.  Murdock Dep. at 94-96. Based on these reports, Murdock decided to terminated Pontolillo for breach of confidentiality and insubordination.  *Id.*; Def.'s Ex. 27.  However, at some point before actually terminating Pontolillo, Murdock learned that Pontolillo had filed a Charge of Discrimination.  Murdock Dep. at 76. Nonetheless, he believed that the charge was a separate matter and had nothing to do with his termination decision.  *Id.*

Murdock subsequently terminated Pontolillo on or about April 24, 2006, for breach of confidentiality and insubordination.  Def.'s Ex. 27.  He gave her a termination letter setting forth the chronology of events regarding her breach of confidentiality.  *Id.*  Pontolillo admits that she breached confidentiality and agreed with the instances specified in the letter except for the alleged March 29, 2006, discussion with Bogdon.  Pontolillo Dep. at 252.  Interestingly, Baugues testified at her deposition that she had been satisfied with Pontolillo's performance before the termination

14

and that she had every intention of Pontolillo's employment working out.  Baugues Dep. at 152-53.

On or about May 3, 2006, just shortly after her termination, Pontolillo filed a second Charge of Discrimination with the EEOC alleging that she was terminated in retaliation for having filed the first charge.  Def.'s Ex. 29.  She subsequently filed this suit on October 13, 2006, after she received a Notice of Rights to Sue from the EEOC.

### III.  SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment is the "put up or shut up" moment in a lawsuit.  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003), *reh'g denied*.  Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997).  It is not the duty of the Court

15

to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *See Bombard v. Fort Wayne Newspapers, Inc*., 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Shields Enters., Inc. v. First Chi. Corp*., 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co*., 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co*., 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

16

# IV.  DISCUSSION

## A.  PONTOLILLO'S TITLE VII SEXUAL HARASSMENT CLAIM

Pontolillo alleges that Pool, her supervisor, sexually harassed her in violation of Title VII. In order to prevail on this hostile work environment claim, Pontolillo must demonstrate that (1) she was subjected to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007).

To qualify as hostile under the third prong, a work environment must be objectively and subjectively offensive.  That is, it must be a work environment that a reasonable person would find hostile or abusive, and one that a plaintiff in fact perceived to be hostile or abusive.  *See Ezell v. Potter*, 400 F.3d 1041, 1051 (7th Cir. 2005).  Teasing, offhand remarks, and isolated, non-egregious incidents are not considered sufficiently severe to satisfy the definition of a hostile environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  In order to evaluate whether a work environment is objectively hostile, the Court considers all of the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir. 1994) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

In addition, under the fourth prong, an employer is strictly liable for harassment by a supervisor when there has been a tangible employment action.  *See Jackson v.  County of Racine*, 474 F.3d 493, 501 (7th Cir. 2007); *Gawley v. Indiana University*, 276 F.3d 301, 309-10 (7th Cir.

17

2001).  Tangible employment actions include discharge, demotion, undesirable reassignment, and decisions causing a significant change in benefits.  *See Jackson*, 474 F.3d at 501; *Gawley*, 276 F.3d at 309.

Here, there is no serious dispute that Pontolillo can meet the first two prongs.  However, St. Vincent argues that she cannot satisfy the third and fourth prongs.  More specifically, St. Vincent contends that Pontolillo cannot demonstrate that Pool's conduct was objectively offensive and it contends that there is no basis for liability because there was no tangible employment action.  Having reviewed the record, the Court disagrees with St. Vincent's conclusions that there is no genuine issue of material fact on these two prongs.

First, contrary to St. Vincent's protestations that Pool's conduct was essentially akin to teasing and innocent back rubs, the Court believes that a jury could conclude that Pools' conduct was objectively offensive.  According to Pontolillo, Pool's conduct of hugging her occurred on a repeated basis over the course of several months.  Moreover, she alleges that Pool would grab her hips and that on at least one occasion he tried to kiss her.  It should go without saying, but such conduct is not normal office behavior and the Court concludes that many if not most women would find that a supervisor's unwelcome grabbing of their hips to be offensive.  Finally, and perhaps strongest of all, Pontolillo asserts that Pool rubbed his erect penis against her body and that it was only about an inch above her own genitals.  *See* Pontolillo Dep. at 126-33.

Second, the Court concludes that there is an issue about whether Pontolillo suffered a tangible action.  According to Pontolillo, she received an unfavorable evaluation shortly after she first made complaints in April 2005.  Although the evaluation was later changed, the initial effect of the evaluation essentially disqualified her from receiving a bonus.  Thus, this action could

arguably be considered a tangible employment action because, at least initially, it led to a significant change in benefits.

But even if the unfavorable evaluation would not qualify as a tangible employment action, the Court finds that the elimination of Pontolillo's position and change in her duties very well could. The change followed shortly after the September meeting with Murdock and after Pontolillo took FMLA leave.  The Court also notes that, for purposes of summary judgment an in the context of Pontolillo's retaliation claims, St. Vincent concedes that this action was an adverse employment. Based on the circumstances, the Court concludes that Pontolillo has raised a genuine issue of material fact on whether the actions taken against her amount to tangible employment action and, accordingly, whether there is a basis for employment liability.

For all of the foregoing reasons, St. Vincent's motion for summary judgment on Pontolillo's Title VII harassment claim is **DENIED**.

## B. PONTOLILLO'S TITLE VII RETALIATION CLAIM

Pontolillo also claims that she was subjected to retaliation for complaining about the sexual harassment.  To establish a claim for retaliation under Title VII, an employee can proceed under either the direct or the indirect method of proof.  *See Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008).  Under the direct method, Pontolillo must demonstrate that (1) she engaged in statutorily protected activity; (2) she suffered an adverse action taken by her employer; and (3) there was a causal connection between the statutorily protected activity and the adverse action. *See id.*  With respect to the third element under this method, something more than a showing of suspicious timing is generally required because mere temporal proximity is insufficient to create a

genuine issue of material fact.  *See id.* at 851.  Under the indirect method, Pontolillo must prove that (1) she engaged in statutorily protected activity; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  *See id.* at 850.

St. Vincent argues that Pontolillo's claim fails under either method.  Regarding the direct method, St. Vincent argues that there is no causal connection between Pontolillo's complaint and any adverse action.  Specifically, it contends that Pontolillo has failed to call into question the veracity of the reorganization of her department and elimination of her original position.  Indeed, St. Vincent notes that Pontolillo's was aware of the ongoing efforts to reorganize the department and in fact was involved in presenting input on that process.  St. Vincent further asserts that Pontolillo has admitted to breaching confidentiality and being insubordinate, both grounds for termination.  Regarding the indirect method, St. Vincent argues that Pontolillo cannot establish that she was meeting legitimate expectations if she was breaching confidentiality and being insubordinate.  Finally, St. Vincent notes that there is a lack of any evidence of comparators to show that Pontolillo was treated less favorably than similarly situated individuals.

Pontolillo has failed to make any explicit response in opposition to St. Vincent's motion for summary judgment, presumably because she is unable to establish a causal connection under the direct method and has no evidence of alleged comparators for the indirect method.[2]  The Court will not attempt to construct an argument on her behalf.  Because Pontolillo has failed to present any

---

[2]  The only references to a retaliation claim are included in Pontolillo's discussion of her FMLA claim.  She makes no separate argument regarding her Title VII retaliation claim.  *See* Pl.'s Memo. in Opp. at 13-16 (Docket No. 69).

evidence demonstrating that there is a genuine issue of material fact on her Title VII retaliation claim, St. Vincent's request for summary judgment on this claim is **GRANTED**.

### C.  PONTOLILLO'S FMLA CLAIM

Pontolillo's final claim is that St. Vincent retaliated against her for taking FMLA leave. Specifically, she contends that the change in job responsibilities for her position, which was done as part of the department reorganization while she was on FMLA leave, constituted a demotion.  She also argues that she was treated less favorably than other similarly situated employees.  The same standards used to evaluate Pontolillo's Title VII retaliation claim apply to her FMLA retaliation claim. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 n. 3 (7th Cir. 2004).

St. Vincent contends *inter alia* that Pontolillo's FMLA retaliation claim cannot be maintained and  should be dismissed because she was unable to return to work after exhausting her twelve weeks of protected FMLA leave.  Although Pontolillo has not responded to this argument, the Court concludes that this argument is dispositive of her FMLA retaliation claim and that further analysis under the retaliation standards is unnecessary.

Generally speaking, FMLA entitlements such as job restoration expire after twelve weeks. *See* 29 U.S.C. §§ 2612, 2614; 29 C.F.R. § 825.214(b).  If an employee is unable to return to work after the required twelve weeks of FMLA leave, she no longer has the protection of the FMLA and job restoration is not required.  *See* 29 C.F.R. §§ 825.214(b), 825.216(d).  Moreover, leave granted in excess of the twelve-week period is not protected by the FMLA.  *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 93-94 (2002).  Finally, several courts have concluded that an employee's rights under the FMLA are not violated when the employee is terminated and he or she

could not return to work after the required twelve weeks of FMLA leave.  *See, e.g.*, *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 784-85 (6th Cir. 1998); *Culbertson v. Wellmont Health Sys.*, No. 2:06-cv-71, 2007 WL 2811361, *2 (W.D. Va. Sept. 25, 2007); *Biggs v. Littlefuse, Inc.*, No. 1:03-cv-225, 2006 WL 3626759, *6 (N.D. Ill. Dec. 8, 2006).

The Court is persuaded that the inescapable conclusion from these cases is that Pontolillo's retaliation claim fails.  It is undisputed that Pontolillo's required twelve weeks of FMLA leave expired in early December 2005 and that she was unable to return to work at that time.  *See* Pontolillo Dep. at 197; Def.'s Ex. 18.  In fact, Pontolillo was not released to return to work until the end of January 2006, and even then she could return to work full time because she was restricted to working only four hours per day.  *See* Pontolillo Dep. at 236-37; Def.'s Ex. 22.  Based on these circumstances, Pontolillo could not make a claim that her substantive rights were violated.  Similarly, the Court concludes that she cannot now claim that St. Vincent retaliated against her for exercising those rights.  *See Mason v. St. Vincent Hospital & Health Care Ctr.*, No. 1:03-cv-930-LJM-VSS, 2004 WL 3242339, *7 (S.D. Ind. Nov. 8, 2004) (granting summary judgment on FMLA retaliation claim because it "add[ed] nothing" to plaintiff's case where her entitlement claim failed on the merits).

Even if Pontolillo could maintain her retaliation claim in the absence of a viable claim that her substantive rights were violated, the Court would still find that Pontolillo's FMLA claim cannot survive summary judgment because she has failed to demonstrate a genuine issue of material fact. Under the direct method, she offers nothing beyond the sequence of events to establish her claim. Moreover, any timing of events is undermined by the undisputed fact that the department reorganization occurred before and during Pontolillo's FMLA leave.  Under the indirect method,

Pontolillo has no evidence that any comparators were treated more favorably.  Indeed, Pontolillo

seemingly ignores that two other individuals were also subject to the reorganization plan and that

their immediate supervisor changed from Pool to Baugues.

Based on the foregoing, St. Vincent's request for summary judgment on the FMLA claim

is **GRANTED**.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, Defendant St. Vincent Health, Inc.'s Motion for Summary

Judgment (Docket No. 61) is **GRANTED in part and DENIED in part**.  Plaintiff Janet E.

Pontolillo's Title VII retaliation claim and FMLA claim are **DISMISSED with prejudice**.  In

addition, to the extent that Pontolillo brings a claim under 42 U.S.C. § 1981, such claim is also

**DISMISSED with prejudice**.  Pontolillo's Title VII claim of sexual harassment remains.

IT IS SO ORDERED:  2/4/09

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

**Electronically distributed to:**

Franklin A. Safrin
SAFRIN & ASSOCIATES
fsafrin@safrinlaw.com

Kevin Joseph Gfell
HALL RENDER KILLIAN HEATH & LYMAN
kgfell@hallrender.com

John Patrick Ryan
HALL RENDER KILLIAN HEATH & LYMAN
jpryan@hallrender.com

23